**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-2237-WJM

LAINE F. SELF,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.

---

**ORDER VACATING DECISION OF ADMINISTRATIVE LAW JUDGE**

---

    This is a Social Security benefits appeal brought under 42 U.S.C. § 405(g). Plaintiff Laine F. Self ("Self") challenges the final decision of Defendant, the Commissioner of Social Security ("Commissioner"), denying his application for supplemental security income benefits and disability insurance benefits. The denial was affirmed by an administrative law judge ("ALJ"), who ruled that Self was not disabled within the meaning of the Social Security Act. This appeal followed.

    For the reasons set forth below, the ALJ's decision denying Self's application for supplemental security income benefits and disability benefits is VACATED and this case is REMANDED for further proceedings consistent with this order.

**I. BACKGROUND**

    Self was born on December 3, 1963, and was 45 years old on the alleged onset date of December 1, 2009. (Administrative Record ("R.") (ECF No. 9) at 185.) Self graduated from high school and has, in the last fifteen years, worked as a pizza delivery

driver, restaurant shift manager, and convenience store clerk.  (R. at 213.)

Self applied for disability insurance benefits and supplemental security income on April 11, 2012, with a protective filing date of December 5, 2011.  (R. at 185, 209.)  Self claimed that he is disabled due to the following conditions: lumbar spine impairment; cervical spine impairment; severe back pain; "spondylolisthesis, blood clots (legs)";[1] "unknown learning disability"; "mental conditions"; depression; and asthma.  (R. at 212.)  His application was denied on August 13, 2012.  (R. at 116.)  Self requested and received a hearing in front of an ALJ, Paul R. Armstrong.  (R. at 131.)  On April 22, 2013, the ALJ issued a written decision in accordance with the Commissioner's five-step sequential evaluation process.[2]

At step one, the ALJ found that Self had not engaged in substantial gainful activity since December 1, 2009.  (R. at 20.)

At step two, the ALJ found that Self suffered from "the following severe impairments: degenerative disc disease and obesity."  (*Id.*)  The ALJ did not find that any other claimed condition was a severe impairment.  (R. at 21.)

---

[1] The Cleveland Clinic defines spondylolisthesis as "a condition in which one of the bones of the spine (vertebrae) slips out of place onto the vertebra below it.  If it slips too much, the bone might press on a nerve, causing pain."  *See* http://my.clevelandclinic.org/health/diseases_conditions/hic_your_back_and_neck/hic_Spondylolisthesis (last accessed May 4, 2015).

[2] The five-step process requires the ALJ to consider whether a claimant: (1) engaged in substantial gainful activity during the alleged period of disability; (2) had a severe impairment; (3) had a condition which met or equaled the severity of a listed impairment; (4) could return to her past relevant work; and, if not, (5) could perform other work in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988.)  The claimant has the burden of proof through steps one to four; the Social Security Administration has the burden of proof at step five.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

At step three, the ALJ found that Self's impairments, while severe, did not meet or medically equal any of the impairments listed in the Social Security regulations. (R. at 22–23.)

Before proceeding to step four, the ALJ assessed Self's residual functional capacity ("RFC"). The ALJ concluded that Self has the RFC "to perform the full range of sedentary work." (R. at 23.) Then, at step four, the ALJ concluded Self could continue to perform his past relevant work as a "sales manager." (R. at 26–27.)

The ALJ's conclusion at step four was, by itself, sufficient to deny Self's disability application. *See* 20 C.F.R. § 404.1520(a)(4). The ALJ nonetheless proceeded to step five and alternatively found that other jobs exist in the national economy that Self can perform. (R. at 27.) Rather than identifying specific jobs that Self could perform, the ALJ used "the grids" (discussed further below) to determine that jobs are available for persons with Self's characteristics. (*Id.*)

Accordingly, the ALJ found that Self was not entitled to Social Security benefits. (R. at 28.) Self appealed to the Social Security Appeals Council (R. at 14), which denied review (R. at 1). Self then filed this action seeking review of the ALJ's April 22, 2013 decision. (ECF No. 1.)

## II. STANDARD OF REVIEW

The Court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. *Id*. "It requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Grogan v. Barnhart*, 399 F.3d 1257, 1261–62 (10th Cir. 2005). In reviewing the Commissioner's decision, the Court may neither reweigh the evidence nor substitute its judgment for that of the agency. *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). "On the other hand, if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### III.  ANALYSIS

**A.    Steps Two & Four: Findings Regarding Depression & RFC**

At Step Two, the ALJ determined that Self's depression was not severe enough to be considered disabling. (R. at 21.) At Step Four, the ALJ determined that Self retained the residual functional capacity (RFC) to perform sedentary work. (R. at 23.) These are separate findings, but most of evidence available to the ALJ on both issues came from testimony and reports that intermingled findings about Self's mental capacity (relevant to Step Two) *and* his physical capacity (relevant to Step Four). Thus, when an ALJ credited or discredited a source at Step Two, he usually did the same (and for the same reasons) at Step Four. Given this, the Court will collectively discuss the evidentiary, testimonial, and credibility issues relevant both to Step Two and Step Four.

The ALJ's reasons for discounting the effects of Self's depression and physical limitations fall into four categories:

   1.    Self's depression has never been diagnosed or treated by a mental health

       professional.

2. Self's depression "seems to stem from his physical pain rather than from a mental condition."

3. Self "made his own diagnosis of depression."

4. Self's physician, Dr. Lundeen, states that Self's back pain "constantly" interferes with his daily tasks, but: (a) at a consultative examination, Self showed some physical capacity, scored high on a "mini mental status examination," and "showed alter demeanor"; (b) Self had previously acknowledged his ability to handle money, go to the movies, visit his mother and brother, talk to his wife, drive, grocery shop, vacuum, do dishes, and take out the trash; and (c) a State Agency psychological consultant found that Self's depression only mildly affected his relevant abilities.

(R. at 21–22.)  Self attacks the first three categories as improper considerations (ECF No. 12 at 12–13),[3] and the Commissioner has no response to these attacks. The Commissioner instead falls back on the fourth category as sufficient to sustain the ALJ's decision regardless of the first three. For thoroughness, however, the Court will address all four categories, determining whether each was an appropriate consideration.

    1.    <u>Diagnosis by a Mental Health Professional</u>

As to the fact that Self's depression has never been diagnosed or treated by a

---

[3] All page citations to ECF documents are to the page number in the ECF header, which does not always match the document's internal pagination.

mental health professional, the Court has not been provided with any authority stating that treatment or diagnosis from a mental health professional is required to establish the severity of depression. *Cf. Fleetwood v. Barnhart*, 211 F. App'x 736, 739 (10th Cir. 2007) ("[W]e have found no case authority requiring her to obtain medical treatment from such a specialist before an ALJ can find that she has a severe mental impairment. The medical evidence[] from her treating physician . . . repeatedly refers to her anxiety and panic attacks . . . ."). Thus, the Court agrees with Self that this was not a proper consideration.

### 2. Depression Stemming from Physical Pain

Concerning the ALJ's statement that Self's depression "seems to stem from his physical pain rather than from a mental condition" (R. at 21), the Court again has been provided with no authority where this makes a difference, *i.e.,* where depression caused by chronic pain is deemed less worthy of consideration. The Court therefore agrees with Self that this was not a proper consideration.

### 3. Self-Diagnosis of Depression

The ALJ's belief that Self "made his own diagnosis of depression" (R. at 21) is an obvious misreading of the exhibit on which the ALJ relied. That exhibit (a letter from Self's primary treating practitioners) discusses Self's chronic back pain and then states, "Other factors relating to this pain is [*sic*] Mr. Self's diagnosis of depression." (R. at 490.) Reading this, the ALJ apparently perceived the last few words as "Mr. Self's *self-*diagnosis of depression." But that is not what the exhibit says, nor does anything else in the exhibit state or suggest that Self diagnosed his own depression. Thus, this was not a legitimate consideration when determining the severity of Self's depression.

### 4. Treating Practitioners' Opinions vs. Other Evidence

Perhaps most important to the ALJ's analysis was an apparent disagreement between the opinions of Self's treating practitioners on the one hand, and various other items of evidence on the other, such as other examiners' reports and the activities of daily living that Self could perform. The Court finds that the ALJ's assessment of Self's day-to-day abilities, which is closely connected to the ALJ's assessment of Self's credibility, affects all of the other sources of evidence. Accordingly, the Court will address that first, followed by the remaining sources.

#### a. *Self's Credibility and Activities of Daily Living*

Self argues that the ALJ improperly discounted his credibility, thus inflating his actual ability to perform daily tasks. (ECF No. 12 at 18.) "Credibility determinations are peculiarly the province of the finder of fact, and [this Court] will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). An ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Plaintiff cites *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995), for the proposition that the ALJ must cite the specific relevant evidence he relies upon in regard to the credibility of a plaintiff's testimony. (ECF No. 12 at 18.) The Court notes that *Kepler* has not been interpreted to require a formalistic factor-by-factor

recitation of the evidence. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). As set forth below, however, the Court finds that the ALJ's decision in this case does not satisfy the requirements of *Kepler*.

Here, the ALJ found Self to be less than fully credible primarily because of Self's abilities to carry out the activities of daily living:

> [W]hile he claims he has difficulty completing tasks and has problems with left thigh numbness, he indicated in his June 2012 Adult Function Report that he is able to take out the trash, do the laundry, wash the dishes, and vacuum. He also indicated he is able to drive a car and go shopping in stores for groceries. While he does have some difficulty with tasks and may do them slower, it appears he is able to perform most activities of daily living.

(R. at 25.) At Self's March 15, 2013 hearing, however, he testified that he could no longer vacuum or do the laundry as of seven months prior to the hearing (R. at 61–62), which the ALJ noted in passing (R. at 25). Self also testified that he needs to "sit down like three times in the course of doing the dishes." (R. at 54–55.) Self's hearing also established that he cannot drive or sit in a car for more than about a half-hour without needing to get out and stretch. (R. at 73–75.) Thus, in reality, Self can take out the trash, wash dishes slowly, drive relatively short distances, and shop for groceries.

In this light, the ALJ's reasoning is insufficient. Despite knowing that Self's ability to perform activities of daily living was more limited than what was described in the "June 2012 Adult Function Report," the ALJ nonetheless relied on that report as if little or nothing had changed. The Court does not hold that the ALJ could never reach the same finding on the evidence presented, but the ALJ's reasoning is, in this instance, effectively no reasoning at all: "the link between the evidence and credibility

determination is missing." *Kepler*, 68 F.3d at 391.  Whether this is reversible error turns on whether the ALJ's other findings are nonetheless sufficient to support his conclusions.  The Court therefore turns to those other findings.

                b.      *Treating Practitioners' Opinions vs. Other Opinions*

Apart from Self's testimony, the ALJ had three sources to draw upon in deciding the extent of Self's depression and the scope of his RFC.

First, by way of written reports, Self's treating practitioners opined that Self was very restricted in his relevant physical and mental abilities, and effectively unable to work.  (*See* R. at 395–402, 461–62, 481–87, 490.)  It appears that Self's primary treating practitioner was PA-C Frances Jenkins, supervised by medical doctor Anna Lundeen.  (*See id.*)  In a letter written by Jenkins and co-signed by Dr. Lundeen, they opine that Self was significantly limited in his abilities due to his chronic pain, other physical ailments, and depression; and that he would probably miss more than three days of work each month because "his condition causes both good days and bad days.  Consequently, his employment opportunities are limited due to his history which presents significant risks to any employer."  (R. at 490.)  The ALJ, however, deemed this "inconsistent with the evidence as a whole which indicates that the claimant is capable of work-related activities."  (R. at 26.)

Second, the ALJ had a report from an examining physician, Dr. Kurt Verguth, who concluded that Self had several physical limitations (*e.g.*, no standing or walking for more than an hour, no frequent lifting or carrying of more than 10 to 15 pounds, etc.), but he did not rule out all possibility of work.  (R. at 473–78.)  Dr. Verguth also reported that Self scored well on a mental status evaluation and was otherwise alert

and attentive throughout the examination. (R. at 477.) The ALJ correctly noted that Dr. Verguth's report supports a finding of continued ability to work (R. at 25), but the ALJ did not explain why that report was more persuasive than those received from Self's treating practitioners.

Third, the ALJ noted a State Agency psychological consultant's conclusion that Self's depression only mildly affected his ability to work. (R. at 22.) But the consultant's report shows that he relied on: (a) the fact that no mental health professional had diagnosed depression, which the Court has already found to be an impermissible consideration; and (b) Dr. Verguth's mental status evaluation, which was not the consultant's own conclusion. (*See* R. at 92.) Thus, there was nothing the psychological consultant's report could add to the ALJ's analysis.

In this light, the Court returns to the ALJ's stated reason for discounting Self's treating practitioners' opinions, *i.e.*, that they were "inconsistent with the evidence as a whole." (R. at 26.) In a sense, it is impossible for a piece of evidence to be "inconsistent with the evidence as a whole," because that "whole" includes the very evidence under consideration, and therefore cannot be inconsistent with it. In the Court's experience, phrases such as "inconsistent with the evidence as a whole" or "inconsistent with the totality of the evidence" are ALJ euphemisms for "inconsistent with the evidence I find more persuasive"—which suggests a foregone conclusion rather than a weighing of evidence.

Even so, that does not give this Court immediate license to vacate or reverse. The substantial evidence standard of review looks only for such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at

1052. The question, then, is whether the evidence the ALJ found more persuasive was substantial enough to support its conclusion. Moreover, when it comes to treating physicians, the ALJ must give "specific, legitimate reasons for disregarding [an] opinion that a claimant is disabled." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995).

Here, the ALJ has not met that standard. In particular, it is not clear whether the supposed inconsistency with "the evidence as a whole" meant that the ALJ was excluding Self's statements about his own daily abilities from that "whole." As already noted, that credibility conclusion was itself not sufficiently supported. Thus, it is unclear whether the ALJ applied the correct legal standard for evaluating Steps Two and Four. Remand is required for further explanation. *See Thompson*, 987 F.2d at 1487 ("if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence").[4]

## B.   Step Four: "Sales Manager"

At Step Four, the ALJ also concluded that Self could perform his "past relevant work as a sales manager." (R. at 26.) This finding resulted from an unusual amount of confusion that arose during Self's hearing before the ALJ, and it is ultimately

---

[4] Self also claims that the ALJ should not have discounted his treating physician's statements "that his use of [opioid painkiller] medications 'would present a red flag [to potential employers] under most circumstances because of possible mental and physical impairment.'" (ECF No. 12 at 13 (quoting R. at 462).) But the ALJ reasonably understood this statement as an overall conclusion regarding Self's ability to work, and such conclusions are not within a treating physician's competence. *See, e.g., Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) ("A treating physician . . . opinion [that a claimant is totally disabled] is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Secretary.").

unsupported by the current record.

Going into the ALJ hearing, Self had never claimed to have worked as a sales manager. Rather, his disability report listed his past relevant work experience as "delivery driver - pizzeria," "shift manager - restaurant," and "store clerk - convenience store." (R. at 213.)

At the ALJ hearing, a vocational expert (VE) was called to testify regarding the nature of these jobs, their skill level, and whether Self could continue to perform any of them. (R. at 76–82.) Drawing on the Dictionary of Occupational Titles ("DOT"), the VE described Self's past relevant work as follows: "[d]eliver[y] driver, food," an "unskilled" position; "store cashier II," an "unskilled" position; and "sales manager," a "skilled" position. (R. at 76–77.) This latter description obviously caught the ALJ's attention because he immediately turned to Self and asked, "When were you a sales manager?" (R. at 77.) Self responded, "That [convenience store] working for my brother." (*Id.*)

At this point, process of elimination should have prompted someone at the hearing to spot the problem with Self's answer. Given that "[d]eliver[y] driver, food" almost certainly referred to Self's time as a pizza delivery driver, and that "store cashier II" almost certainly referred to Self's time as a convenience store clerk, the VE almost certainly meant "sales manager" to refer to Self's time as a restaurant shift manager. Remarkably, however, everyone took Self's response at face value. In other words, everyone (including the VE) immediately came to accept that "sales manager" was the VE's way of referring to a convenience store clerk.

Nonetheless, sensing the incongruity of calling a convenience store clerk a "sales manager," the ALJ pressed for more information. The ALJ knew from Self's

testimony earlier in the hearing that Self had worked the graveyard shift at the convenience store. (*See* R. at 37.) The ALJ therefore turned to the VE and had the following exchange:

> ALJ: Your [*sic*] sure that wasn't more like an attendant? Convenience store attendant or something, [at] night?
>
> VE: Have him give me a better description then.
>
> ALJ: Well, he was the night guy at a convenience store. It was a gas station, right?
>
> [Self]: Yes, sir.
>
> ALJ: Gas station/convenience.
>
> [Self]: Yes, sir.
>
> ALJ: So, I don't—I mean, he handled—he was the manager while he was there, but he was like a night manager at a convenience store. That doesn't sound like a sales manager job.
>
> VE: Well, hold on. Let me see if I come up with a different kind of manager then.

(R. at 77.)

While the VE searched the DOT, Self volunteered some information that only increased the parties' erroneous belief that "sales manager" must be referring to his time in the convenience store: "The sales manager title," said Self, "is like an assistant manager, but they [*i.e.*, the convenience store owners] don't call it an assistant manager." (R. at 78.) "They call it the sales manager?" the ALJ asked, to which Self replied, "Yes, sir." (*Id.*)

Eventually, the VE announced that the DOT did not contain any entry for "night

store manager." (R. at 79.)⁵ At this point, the ALJ seems to have abandoned his skepticism: "Okay, okay. So, sales manager, okay." (*Id.*) He then went on to ask hypotheticals based on Self's ability to return to work as a sales manager. (R. at 79–80.) Finally, as noted, the ALJ ultimately concluded at Step Four that Self could indeed return to work as a sales manager, and therefore was not disabled. (R. at 26.)

This was error, and it was not harmless. The ALJ based his conclusion on a type of job that Self may have never actually performed. Upon review of the record, it is obvious that the VE originally classified Self's convenience store position as an unskilled "store cashier II." (R. at 76.) Only through a muddled series of questions and answers did all parties come to assume that Self's convenience store position fell under the VE's "sales manager" classification.

As far as the Court is aware—and the Court is neither a vocational expert nor intimately familiar with the DOT—Self's convenience store position could still theoretically fit within the DOT's definition of sales manager. But the record as developed thus far does not support that conclusion. The VE noted that sales manager is a "sedentary" position. (R. at 77.) Self, on the other hand, described his position in terms of standing for his entire 10-hour shift, carrying 50-pound totes full of merchandise, cleaning toilets, and various other activities that do not seem to fit the "sedentary" label. (R. at 37–38, 45–46.)

It is also possible that the sales manager classification might correctly apply to

---

⁵ Ironically, the occupational classification the VE probably should have been looking for was the very classification he already gave for Self's convenience store position, "store cashier II." (*See* ECF No. 12 at 21 n.4 ("The job of 'convenience store clerk' is included in the Dictionary of Occupational Titles under code 211.462-010 for Cashier II . . . .").)

...

the job to which the VE had originally assigned it, *i.e.*, Self's position as a restaurant shift manager. But again, the current record does not support that conclusion. Self stated that he was a "host" at a restaurant where he did some paperwork (*e.g.*, inventory) but largely spent his 8-hour shift working the cash register, seating customers, bussing tables, moving racks of clean dishes and silverware (some of which weighed 30 pounds), and other tasks that do not easily fit the definition of "sedentary."

Thus, a remand is required to develop an accurate picture of where Self's prior work fits within the DOT classifications. Only then can the ALJ properly determine whether Self can return to his past relevant work.

## C.     Step Five: The Grids

The Commissioner states that any error at Step Four is harmless in light of the ALJ's alternative finding under "the grids" that work exists in the national economy for persons such as Self. (ECF No. 15 at 21.) However, as explained below, the ALJ's previous errors carry over into his alternative finding. The alternative finding therefore cannot be sustained.

The Tenth Circuit has previously explained,

> The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. The grids thus may provide a shortcut in certain circumstances to determining whether a claimant can perform other work by obviating the need for a vocational expert's testimony.

*Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998). The ALJ concluded that Self fell within the grids at Medical-Vocational Rule 201.21 (*i.e.*, 20 C.F.R., pt. 404, subpt. P,

app'x 2, tbl. 1, row 201.21).  (R. at 27.)  Rule 201.21 states that a person limited to sedentary work is not disabled if that person has at least a high school education and previous "[s]killed or semiskilled" work experience.

For at least three reasons, this finding cannot be sustained.  First, it ignores the potential that Self's depression may be a disabling factor that requires special consideration, thus preventing the ALJ from applying the grids mechanically.  *See* 20 C.F.R., pt. 404, subpt. P, app'x 2, § 200.00(e)(2).  In other words, if on remand the ALJ finds that Self's depression is severe, the grids cannot apply without additional considerations.  Second, it assumes that Self can perform sedentary work, which is also not supported on the current record.  Third, it assumes that Self has prior "skilled" work experience—a conclusion that could only come through the mistaken belief that he had been a sales manager (the only job classification described by the VE as "skilled").  For these reasons, the ALJ's alternative finding under the grids is insufficient to remedy the previously noted deficiencies.  The ALJ's decision will be vacated and the case remanded for further proceedings.

## IV.  CONCLUSION

For the reasons set forth above, the Commissioner's decision is VACATED and this case is REMANDED to the Commissioner for rehearing.

Dated this 8th day of May, 2015.

BY THE COURT:

William J. Martinez
United States District Judge